---

(33 Misc. Rep. 675.)

### In re ELTING.

(Surrogate's Court, Westchester County. January, 1901.)

1. TRUSTEES—ACCOUNTING—INTERMEDIATE ACCOUNT—DECREE—PROTECTION TO TRUSTEE.

Where a testamentary trustee in good faith made payments to life tenants, regarding the funds as income, and such payments were confirmed on intermediate judicial settlements without objection, the decree establishes the law of the case as to the character of the funds, and the payments could not be questioned on the final accounting.

2. CORPORATIONS — LIQUIDATION — ASSETS — SALE—PROCEEDS—DISTRIBUTION— CAPITAL—INCOME.

Where testator's will directed that stock of a street railroad be held by the executor as a part of the trust estate created, and several years after his death the company leased its business and assets to another corporation, save certain real estate, which it sold, and distributed the proceeds among the stockholders, such real estate having been included in that portion of the company's assets included in the list of road and equipment, and it not being presumable that the testator could have contemplated the great increase in the value of the road's franchise, the proceeds of the sale should be regarded as capital, and hence went to the remainder-men, and not the life tenants.

Judicial settlement of the account of Peter J. Elting, as testamentary trustee under the will of Abijah Curtiss, deceased.

R. E. & A. J. Prime, for trustee.

Blair & Rudd, for Mary R. and Frederick H. Curtiss, two of the life beneficiaries.

J. Q. A. Johnson and Edgar Logan, special guardians for infant remainder-men.

SILKMAN, S. This proceeding is erroneously entitled an intermediate settlement, when in fact it is a final judicial settlement of

the accounts of the trustee to the 1st of May, 1900, the date fixed in the account filed. There may be any number of final judicial settlements, and there have been several in this estate. One matter only is in dispute in this proceeding, and that is as to whether certain dividends declared by the Sixth Avenue Railroad Company of the City of New York out of the proceeds of real estate belong to principal rather than to income.

The testator, Abijah Curtiss, was, a few years prior to his death, which occurred in 1888, president of the Sixth Avenue Railroad Company. That company was organized in September, 1851, and thereafter, and down to the year 1892, operated a street railway in the city of New York, through the use of horses. The original capital stock was $750,000. This was increased in 1885 to $1,500,000, and again in 1891 to $2,000,000. The increase in 1885 was effected by a sale of new stock at par, the money received being used in the improvement of the road and in changing the character of its rails. The increase to stock in 1891 was made to retire bonds of the company of an equal amount, and the new stock was substituted for the bonds. For many years the company paid regular dividends out of the net earnings of from 7 to 8 per cent. per annum. About the time of the organization of the company they began purchasing real estate for depot stables and car houses at Sixth avenue, Forty-Third and Forty-Fourth streets, increasing the plant from time to time by the purchase of other lots as the business required, until they had acquired some 29 lots of land. They also acquired certain real estate at Sixth avenue, Fifty-Eighth and Fifty-Ninth streets, which, with the exception of a very small portion used as a waiting room, was never used for railroad purposes, but was allowed to remain as vacant land. The testator, at the time of his death, owned 264 shares of the stock of the company, which shares have since been held by his executors and trustees under the authority contained in his will. When a division of the trust took place, these shares were apportioned among the several trusts.

In 1892, by lease dated March 1st, the Sixth Avenue Railroad Company leased to the Houston, West Streets and Pavonia Ferry Railroad Company, otherwise known as the "Metropolitan System," its entire railroad franchises, horses, cars, and railway property of every description, excepting its depot and stable property at Sixth avenue, Forty-Third and Forty-Fourth streets, and the real estate owned by the lessor on Sixth avenue, Fifty-Eighth and Fifty-Ninth streets. The term of the lease was 800 years, at an annual rent, for the first two years, of $152,500, and thereafter at the annual rent of $145,000. The lessee agreed to spend $1,000,000 in substituting other motive power in place of horses, and also to pay all taxes, license fees, etc. At the expiration of the lease the lessee agreed to return the leased property in its improved condition to the lessor. Pursuant to the agreement, the lessee has spent in improvements on said road, and in changing the motive power, more than the $1,000,000 required by the lease. The condition of the affairs of the company at the time of testator's death is shown by a sworn statement filed with the railroad commissioners. The cost of road and equipment are put down

at $2,041,175.30; capital stock, $1,500,000; bonded debt, $500,000; surplus, in profit and loss account, $19,515.75. The only investment shown by the statement, other than the cost of the road and equipment, were stocks and bonds of other companies, $6,300. The cost of the real estate must have been included in the item of cost of road and equipment. The condition of the company, just prior to the lease to the Metropolitan system, is shown by their sworn statement filed with the railroad commissioners for the quarter ending December 31, 1891. The cost of road and equipment was practically the same, the capital stock was $2,000,000, there were no bonds, and the surplus account was increased about $95,000. After the lease to the Metropolitan system, the Sixth Avenue Railroad began to sell off the real estate which had been reserved in the lease, first selling the property at Sixth avenue, Fifty-Eighth and Fifty-Ninth streets, and subsequently the property at Sixth avenue, Forty-Third and Forty-Fourth streets, so that at the present time all of this real estate has been sold. The aggregate sales amount to about $1,695,000. The proceeds received up to the present time have been declared and paid out in what has been termed "real-estate dividends," as follows:

|                      | Per Cent |
| --- | --- |
| October 1, 1892      | 1¾ |
| November 1, 1895     | 20 |
| July 3, 1896         | 6 |
| October 1, 1896      | 6 |
| October 20, 1897     | 6 |
| October 1, 1898      | 1½ |
| July 1, 1900         | 3 |
| Total                | 44¼ |

There is left to be distributed the balance of the proceeds of the Sixth avenue, Forty-Third and Forty-Fourth streets property, amounting to $800,000, and which will go to the stockholders by a further dividend of 40 per cent. upon the par value of their stock.

Since the declaration of the first of these real-estate dividends, on October 1, 1892, there have been a number of final judicial settlements of the accounts of the executors and trustees under the will of Abijah Curtiss. Those accounts show that the dividends which had been received at the time of such accountings had been distributed by the executors and trustees to the life beneficiaries as income. No question was raised as to the propriety or legality of such payments, the accounts were judicially settled and allowed, and it is upon this accounting the question is raised for the first time. It is now insisted by the special guardians that these dividends were a distribution of the capital of the company, and consequently belonged to the principal of the trust estate, and were improperly distributed to the life tenants.

I decided upon the hearing, and I think correctly, that the accounting trustee acted in good faith, that the former decrees upon the judicial settlements had established the law of the case in the nature of stare decisis to the extent of justifying him in following the precedents which had been established, and which had had the sanction of the court upon the former accountings, and that such payments

so made in good faith could not be questioned or disallowed in this proceeding. Some other method must be taken to recover back the money erroneously distributed.

While, as between the party receiving the money and benefiting thereby and the party legally entitled thereto, there may be an absolute right to recover, a trustee is liable only when he has acted in bad faith, or failed to exercise the reasonable discretion which a prudent man would exercise in respect of his own affairs. The former decrees of this court are sufficient to justify the trustee's action. I will therefore consider the question presented for the purpose of determining the future duty of the trustee, when the further real-estate dividend of 40 per cent. shall have been declared. ·

In ascertaining the law to be applied to the facts, it is unnecessary to examine other than the three leading cases in the court of appeals. In re Kernochan, 104 N. Y. 618, 11 N. E. 149; McLouth v. Hunt, 154 N. Y. 179, 48 N. E. 548; In re Rogers, 161 N. Y. 108, 55 N. E. 393. In the latter case, which arose in this court, every authority upon the subject, both in this country and in England, was called to the attention of the court, either by counsel or in the opinions below. The law as established in this state by these cases makes the disposition of the question under consideration without difficulty. Counsel for the life beneficiaries states in his brief that "this is one happy case where we are not set to digging out with inadequate tools what the testator, as a matter of law, must have contemplated in a mass of legal contingencies which, as matter of fact, he never contemplated. If Abijah Curtiss meant such dividends as these to be income, he has failed to so say in express terms; if he intended them to be principal, the law steps in to say his intentions cannot control." In this the learned counsel is in error. The point where we must begin to approach the question is the condition of the company and its capital at the time of the testator's death, and as it must have been contemplated by him when he made his will, and expressly provided that his trustees might retain as part of the trust estate the securities representing part of the capital of the Sixth Avenue Railroad. The intention of the testator in every case is to govern where it can be ascertained and can be carried out within lawful limits. The testator had power to make capital distributable as income. He had no power, however, to make profits earned subsequent to his death capital; for this, in effect, would create an illegal accumulation. In re Rogers, 22 App. Div. 431, 48 N. Y. Supp. 175. I do not regard the action or the resolutions of the Sixth Avenue Railroad of any moment. It was said, in the Kernochan Case, that whatever the corporation determined to be capital was capital, and whatever it determined to be income was income; but the authority of that case is much confined and limited by the McLouth Case, in which Judge O'Brien says "that, while such a rule might have the merit of simplicity and convenience, it ought not to determine property rights of parties interested in the corporate property." While the action of a corporation cannot determine the property rights of the parties interested in the corporate property as between themselves, such corporate action, however, should

be sufficient to exonerate a trustee acting thereon in good faith, otherwise the office of trustee would be dangerous, indeed, when the trust estate was invested in the stock of corporations, and a trustee would only be safe in paying over dividends when he had a decree upon an accounting directing the payment to protect him. In the case before us the corporation did not commit itself in regard to the character of the money distributed in dividends, except to the extent that it was the proceeds of real estate.

Mr. Curtiss, by reason of his conceded intimate connection with the company, must have been familiar with its affairs and financial condition, and he must have known and considered that the stock which he held, and passed on to his executors and trustees, represented that proportion of the assets of the company included in the item of "cost of road and equipment." The enormous increase in the value of railroad franchises, and the improvements in railroading which took place years afterwards, and which have made street railways profitable to an extent not dreamed of 15 or 20 years ago, could not have been contemplated by the testator. We cannot say that he did more than to realize that he had a good security proper for his executors and trustees to hold, and which was represented by a plant that had cost the company about $2,000,000, subject only to a bonded debt of $500,000. The necessary conclusion from the sworn statement made by the company to the railroad commissioners, without further figures or evidence before us, is that the entire capital of the company went into the building and equipping of the road and the purchase of its real estate. The surplus shown was too insignificant to have included the latter item.

These real-estate dividends were not dividends declared by a going concern in the ordinary course of business. The Sixth Avenue Railroad, upon its lease to the Metropolitan system, ceased to be a going concern, and began a partial liquidation by the sale of the very property which, if it were a going concern, would be absolutely necessary to its business. The distribution of the proceeds of real estate in dividends must be looked upon and viewed as was the distribution of the assets of the corporation which figured in the Rogers Case. If the Sixth Avenue Railroad were a going concern, and they had accumulated a large amount of profits which it had invested in the plant, they might, by resolution or action of its directors, have directed that property which had been a part of its original capital be substituted for the accumulated profits, and thereafter the real estate so originally purchased with capital might take on the character of profits, and the accumulated profits the character of capital. This was not done, and there is no ground to assume that it should have been done. There is no evidence of accumulated earnings being invested in the plant. The evidence before us leads to the conclusion that the contrary was the fact. It is undoubtedly true that the value of the franchises of the Sixth Avenue Railroad, by reason of the change in the character of street railroading, and by reason of the vast increase in street-railway travel, and by reason of the connections made possible by the Metropolitan system, have increased enormously in value; nevertheless, this increase is in no sense profits

derived from earnings. Dividends entitled to be distributed to life
beneficiaries as income are paid from profits derived from net earn-
ings. These arise from, and are the result ordinarily of, the busi-
ness to do which the company was incorporated. If the company
was incorporated to buy and sell and speculate in real estate, the
increase in value of the land in such a case would necessarily be earn-
ings, because it was for the purpose of taking advantage of such in-
crease.that the corporation was organized; but where a testator dies,
we will say, possessed of a large tract of unimproved real estate,
and, by reason of altered conditions, convenience of access, or other
reason, it becomes several times as valuable as it was at the time
of his death, such increase in value is a natural increase of principal
and not of income. To hold otherwise would open the door to end-
less litigation and dispute, and subject the determination of rights
as between life beneficiaries and remainder-men largely to the un-
certainty of expert opinions upon values. In this case, while the
value of the corporate property is very largely increased, the life
beneficiaries get the benefit by the increased earnings and the in-
creased dividends. The lease to the Metropolitan system was made
for the purpose of insuring a 7 per cent. dividend upon the capital
stock of the Sixth Avenue Railroad Company. The life beneficiaries
here, in addition to this dividend, will receive the income upon the
moneys received by the trustee as the proceeds of the corporation's
real estate, and so the benefits are divided between the life benefi-
ciaries and the remainder-men.

The investment by the lessee provided for in the lease of $1,000,000,
to be used in improving the plant and changing the motive power,
was not an earning of the Sixth Avenue Railroad Company out of
which profits could be paid; it was merely a guaranty of the fulfill-
ment of the obligations of the lessee; it was to be expended imme-
diately, in order that the fulfillment of the terms of the lease might
be insured, and the lessor might be indemnified in case of having
to repossess itself of the property. Considering the long term of the
lease, it was not a large sum to be required to be expended; in fact,
during the continuance of the lease, many millions more will be re-
quired to be expended for the same purpose. The repairing and
maintenance and replacing worn-out tracks, cars, horses, motors, or
things of that character, are presumably to be paid out of the in-
come, and, had the railroad remained in the possession of the lessor,
these extensive repairs might have had to be paid out of earnings.
If the company had, from time to time, set aside out of the earnings
certain amounts to be applied when needed to rebuild and recon-
struct the road, it could not be claimed that this would not be a
proper application of earnings, although, naturally, it would have re-
duced the dividends.

Of course, we know that the life beneficiaries are usually the ones
for whom a trust-maker has a special regard, and, in cases of doubt,
it may be presumed that he intended to benefit the life tenants.
There is nothing, however, in the case before us raising the slight-
est doubt as to the character of the money distributed, and no un-
certainty as to the conditions which the testator must have contem-

plated in making his will. The decree will therefore contain a direction that the trustee invest all real estate dividends which have been or shall be declared and paid by the Sixth Avenue Railroad subsequent to the filing of objections by the special guardians in this proceeding.

Decreed accordingly.